## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **DONALD L. TRIMBLE,** | |
| **Plaintiff,** | **8:18CV162** |
| **vs.** | |
| **ANDREW SAUL,[1] Commissioner of Social Security;** | **MEMORANDUM AND ORDER** |
| **Defendant.** | |

This matter is before the Court on the Motion for an Order Reversing the Commissioner's Decision, ECF No. 16, filed by Plaintiff Donald L. Trimble, and the Motion to Affirm Commissioner's Decision, ECF No. 17, filed by Defendant Andrew Saul ("Commissioner"). On February 8, 2019, the Court entered an Order holding its decision in abeyance pending the Eighth Circuit's decision in *Thurman v. Comm'r*, No. 18-3451, which was issued on June 26, 2020. For the reasons stated below, the Motion for an Order Reversing the Commissioner's Decision will be denied and the Motion to Affirm Commissioner's Decision will be granted.

### PROCEDURAL HISTORY

Trimble filed for Title II benefits on November 17, 2016. Tr. 11.[2] His claim was denied initially on February 2, 2017, and again on reconsideration on July 6, 2017. *Id.* He

---

[1] Trimble originally named Nancy A. Berryhill, Acting Commissioner of Social Security, as the Defendant in this action. Andrew Saul became the Commissioner of Social Security in June 2019, and he has been automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

[2] Pinpoint citations to the transcript of the Administrative Record ("Tr.") shall be to the consecutively numbered pages in the record rather than to the Page ID of the docket.

requested a hearing, which was held on November 1, 2017. The Administrative Law Judge (ALJ) issued a written opinion denying benefits on December 26, 2017. Tr. 22.

An ALJ follows a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found Trimble's date last insured[3] was December 31, 2016, and that he had not engaged in substantial gainful activity from January 4, 2016 through his date last insured. Tr. 13.

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii) & (c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities," 20 C.F.R. § 404.1520(a)(4)(ii) & (c), and satisfies the "duration requirement." 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple

---

[3] "In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status." *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); *Stephens v. Shalala*, 46 F.3d 37, 39 (8th Cir.1995)). Insured status is determined by applying the formula contained in 42 U.S.C. § 423(c).

2

instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that, through the date last insured, Trimble had the following severe impairments: degenerative disc disease of the lumbar and cervical spine with residuals of surgery; mood disorder; and anxiety disorder. Tr. 13.

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that, through the date last insured, Trimble did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 13.

Step four requires the ALJ to consider the claimant's residual functional capacity[4] ("RFC") to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant can perform any past relevant work, the ALJ will find that the claimant is not

---

[4] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1545(a)).

3

disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ found that, through the date last insured, Trimble had the RFC to perform "sedentary work" as defined by 20 C.F.R. 404.1567(a), except Trimble "can stoop, kneel, crouch, and crawl occasionally; can perform work that is simple and can respond appropriately to routine changes in the workplace; and can perform work that does not require more than superficial and incidental public contact." Tr. 15. Ultimately, the ALJ concluded that, through the date last insured, Trimble was unable to perform any past relevant work. Tr. 20.

At step five, the ALJ must determine whether the claimant is able to do any other work considering the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can do other work, he is not disabled. *Id.* The ALJ determined that there were jobs in significant numbers in the national economy that Trimble could perform, and, therefore, Trimble was not disabled. Tr. 20-21.

On March 7, 2018, the Appeals Council denied review, and the ALJ's decision stands as the final decision of the Commissioner. Tr. 1-5. On April 12, 2018, Trimble filed a Complaint with this Court for judicial review of the agency decision. Compl., ECF No. 1.

## FACTUAL BACKGROUND[5]

## I. ADMINISTRATIVE HEARING TESTIMONY

Trimble's administrative hearing was held on November 1, 2017, and Timothy Cuddigan appeared as his attorney. Tr. 27. Cuddigan prepared a prehearing brief

---

[5] This Court's General Order No. 2015-05 instructs that a plaintiff challenging a final decision of the Commissioner of the Social Security Administration (SSA) shall include in his or her brief supporting a motion to reverse the decision "a statement of material facts," which is "supported by page references to the administrative record." The Commissioner must then file a motion to affirm its decision and include with his or her supporting brief "a non-repetitive counter-statement," if the Commissioner disagrees with any portion of the plaintiff's statement. This section is a synthesis of their competing statements.

summarizing various parts of the claim and presenting a theory of disability. *See* Tr. 31-32, 276-78. Cuddigan said that since the prehearing brief was sent, pay stubs were added as exhibit 8-D; and, based on sick time, it was reasonable to amend Trimble's onset date to February 29, 2016, because payments he received after that date were for accumulated benefits and not for ongoing work activity. *See* Tr. 32, 190-92. Cuddigan also said the opinion of Dr. Cornett, not yet in the record, supported disability; the treating physician's assistant opined Trimble could work only four hours at a time; and Trimble had a good work history, having retired from the military after more than 20 years of service, with a few deployments. Tr. 33.

Trimble joined the military in 1990, beginning his army career as an active duty Army Ranger, before eventually joining the National Guard, and then the Army Reserves. Tr. 53-54, 354. His job titles in the military included infantry and military police. Tr. 54. In 1998, Trimble began working as a state trooper. Tr. 51. Trimble said he turned in his State Patrol equipment on March 13, 2016; qualified with a pistol on April 20, 2016; and did not work since. Tr. 36. He was paid out accrued sick and holiday time. Tr. 36-40. Trimble had difficulty with light-duty desk work due to pain in his arms and legs, and radiculopathy into his hands and feet. Tr. 41. He also had difficulty with concentration due to pain. Tr. 41. Trimble had back fusion surgeries in 2015 and 2016 and a neck surgery in 2006. *See* Tr. 41-42. He said the second back surgery was a failure and, "[i]f anything it made it worse." Tr. 42. He suffered pain in his lower back, which radiated into his buttocks and down his legs to his toes. Tr. 42. His arms and hands constantly felt numb. Tr. 42. He had neck pain that radiated down his left side and was beginning to radiate down his right side. Tr. 42. He believed his mind did not function as it should. *See* Tr 42-43. Trimble used various

5

modalities to treat his pain and saw a pain doctor through the Department of Veterans Affairs ("VA"). *See* Tr. 43-44. Through the VA, he had radio frequency ablations as well as injections. Tr. 44. A trial run of a spinal cord stimulator had not helped, so a permanent implant was not pursued. *See* Tr. 44.

During the hearing, Trimble had to shift and stand. *See* Tr. 44-45. He said he could sit or stand for about 20 minutes on average before needing to change positions or lie down. Tr. 45-46. He cared for his one-year-old child during the day, which he found difficult. *See* Tr. 48-49. He testified that he went on 5-7 block walks with his family, using a stroller for support. Tr. 46. Trimble had difficulty completing household chores, and often took breaks to stretch due to pain. *See* Tr. 49-50.

The ALJ's first hypothetical question posed to the vocational expert involved a worker limited to light work with additional limitations that were included in the ALJ's eventual RFC finding. *See* Tr. 15, 60-61. The vocational expert identified light unskilled jobs that such a person could perform. *See* Tr. 65. The ALJ's second hypothetical question reduced the worker's exertional level to sedentary, but otherwise included the same limitations plus a limitation that the worker "is able to perform work that allows the worker to stop work, to stand and stretch for one minute every 30 minutes." Tr. 66-67. The vocational expert said: "I think that's doable in many work settings. However, I think it would be considered an accommodation." Tr. 67. The vocational expert said there would be no sedentary jobs that would allow a worker to stop work and stretch for a minute every half hour. Tr. 67.

The ALJ's third hypothetical mirrored the second, but it directed the vocational expert to eliminate the one-minute break every thirty minutes. Tr. 68. The vocational

6

expert identified a document-preparer job the ALJ had suggested, *see* Tr. 67-68, as well as a telephone quotation clerk, a charge account clerk, and an addresser. Tr. 68-69. The vocational expert said that while a telephone quotation clerk would talk to people on a telephone, the communication was "kind of robotic almost" and "not really communicating." Tr. 69. The ALJ stated: "Okay. Well, let's put that aside." Tr. 69. The vocational expert then identified the job of eye-glass frame polisher. Tr. 69-70. The ALJ's third hypothetical became his RFC finding, and the jobs identified by the vocational expert, including the telephone quotation clerk, became the jobs the ALJ identified to support a "not disabled" finding at step five of the sequential evaluation process. *See* Tr. 15, 21. Cuddigan asked a hypothetical question that involved alternating sitting and standing every 20 minutes, which the vocational expert said would preclude sedentary employment. Tr. 70. Cuddigan also asked whether a person, while standing, could perform the jobs identified in response to the ALJ's third hypothetical. *See* Tr. 71. The vocational expert said, "No, probably not. The thing is set up for them to be in a seated position. Once in [a while] job analysis is done where they do an accommodation . . . raised desk where they can stand. They have a desk that's adjustable." Tr. 71. The vocational expert also testified that missing four days of work per month would preclude competitive employment, and not being able to sit for two hours or stand or walk for two hours, precluded competitive employment. Tr. 72.

## II. MEDICAL EVIDENCE

### A. Medical Opinion Evidence

On March 30, 2015, Trimble saw a V.A. neurosurgeon, Dr. Chris A. Cornett, regarding low back and leg pain. Tr. 421. Injections were no longer providing Trimble any

relief and he had problems with his left leg intermittently giving out on him. Tr. 421. Dr. Cornett reviewed imaging; noted that the MRI did not explain the severity of Trimble's symptoms; and ordered a CT/myelogram. Tr. 422, 320-22. Dr. Cornett reviewed the CT/myelogram and concluded the imaging showed some bone spurs were likely compressing Trimble's L5 nerve roots. Tr. 425. Trimble opted for surgery, and on May 11, 2015, Dr. Cornett performed a lumbar decompression of Trimble's L5 nerve root as well as a fusion at the L5-S1 level of Trimble's spine. Tr. 425-26, 318, 657-59). Trimble received a back brace and physical therapy before his discharge from the hospital on May 13, 2015. Tr. 338, 464, 512.

On June 22, 2015, Trimble returned to Dr. Cornett. Tr. 485. Trimble was doing well, and, on some days, he did not need pain medication. Tr. 485. His left leg pain was gone, and he had no trouble ambulating. Tr. 485. He was happy with the procedure at that point and wanted to go back to work. Tr. 485-86. Dr. Cornett recommended Trimble wear his lumbar corset while at work and wrote him a "return to work note." Tr. 486.

On September 28, 2015, Trimble told Dr. Cornett that his left-leg radiating pain occurred occasionally but that it improved after surgery. Tr. 487. His low back pain persisted. Tr. 487. Dr. Cornett reviewed x-rays, Tr. 316, but saw no cause for concern. *See* Tr. 487-88. Trimble wanted to start physical therapy and exercise to resolve some of his low-back-pain issues, and Dr. Cornett prescribed physical therapy. Tr. 488. On December 2, 2015, Trimble contacted Dr. Cornett's office and said he had a "hot poker"-like pain going down both legs, and to his left foot. Tr. 488. On December 4, 2015, Trimble went to a VA emergency room for emergency treatment for this issue. *See* Tr. 489-92.

8

On December 7, 2015, Trimble saw Dr. Cornett. Tr. 498. Oxycodone Trimble received from the emergency room had not been helpful, and he could not take it at work because he was a state trooper. *See* Tr. 498. Dr. Cornett reviewed imaging, Tr. 315, and decided a new CT myelogram was needed, Tr. 499. He also started Trimble on Lyrica and tramadol. Tr. 499. The pharmacist denied Lyrica, and instead recommended a trial of gabapentin. Tr. 501. The CT and myelogram were performed on December 14, 2015, and a right L5 transforaminal epidural steroid injection was performed on December 23, 2015. Tr. 310-13. Trimble also started chiropractic treatment. Tr. 386.

On January 4, 2016, Trimble returned to Dr. Cornett. Tr. 523-24. Dr. Cornett noted the recent injection helped "maybe for just the one day but no lasting relief." Tr. 524. There was some slight weakness on dorsiflexion on the left and Trimble appeared uncomfortable. Tr. 524. Dr. Cornett explained: "Overall, I see nothing serious or dangerous going on [in imaging] and I cannot completely explain his symptoms nor why he did well for a period of time and now has some increasing symptoms." Tr. 524. Dr. Cornett referred Trimble to neurology, chiropractic treatment, and aquatic therapy; and discussed the potential for radio frequency ablation at some point. Tr. 524. Dr. Cornett provided current physical limitations that included no sitting for over two hours, no standing/walking for over two hours, and "[p]atient may not be able to complete a full shift due to pain/discomfort". Tr. 856.

**B. Post-onset Date Records**

On January 14, 2016, Trimble received a Transcutaneous Electrical Nerve Stimulation ("TENS") unit and saw his primary care provider, Kent Peters, PA-C. Tr. 527-28. Trimble had some decreased cervical and lumbar range of motion and full range of

motion of all extremities. Tr. 531. Peters noted that Trimble's cranial nerves were intact, and he had no focal motor or sensory deficits. Tr. 531. Trimble was scheduled for a March radiofrequency ablation. Tr. 529. Peters continued Trimble's current prescriptions of NSAIDs, oxycodone and gabapentin. Tr. 531. Trimble received chiropractic treatment in late January. Tr. 845, 388. On February 3, 2016, he received left lumbar medial branch block injections. Tr. 308-09.

On February 4, 2016, Trimble sought a second opinion for his ongoing back issues from Dr. John Treves, M.D. Tr. 287-89. Dr. Treves noted that Trimble exhibited diminished lumbar flexion and was able to ambulate unassisted with a slight limp. Tr. 287. Trimble's cervical spine range of motion was good and without limitations; he had no tenderness to palpation of the spinous process and paravertebral muscles bilaterally; and his straight leg raises did not produce radicular pain or paresthesias bilaterally. Tr. 287. Trimble demonstrated normal strength, tone, and bulk of the deltoids, biceps, triceps, and intrinsic musculature bilaterally and did not have any gross instability of the upper or lower extremities. Tr. 287-88. Dr. Treves ordered lumbar flexion and extension x-rays. Tr. 288. Dr. Treves noted Trimble had "a few millimeters of retrolisthesis at L4 and L5 with a congenitally small canal. A December 14, 2015, CT scan of Trimble's lumbar spine showed he had left L4-L5 disk herniation and moderately severe junctional stenosis L4-L5 above the fused segment." Tr. 288. Dr. Treves also reviewed Trimble's neck pain, which had been worsening over the prior one to two months. Tr. 288. Trimble planned to get an MRI of his neck from the VA. Tr. 288. Dr. Treves noted: "With respect to his low back, I think he is symptomatic of the junctional disk herniation and stenosis at L4-L5." Tr. 288. Dr. Treves did not think a spinal cord stimulator would help this structural

10

problem, and if surgery were performed it would be an exploration of the fusion at L5-S1 with a decompression at L4, a left L4-L5 diskectomy and interbody fusion extending instrumentation to the L4 level. Tr. 288.

On February 9, 2016, Dr. Treves noted that Trimble's February 4, 2016, lumbar flexion and extension x-rays showed postoperative changes at L5-S1. Tr. 290. The interbody graft was nicely incorporated and in good position; there were no hardware complications; Trimble's alignment appeared anatomic; and he had no instability with flexion or extension maneuvers. Tr. 290. Trimble agreed to proceed with an L4 decompression and extension of his fusion up to the L4-L5 level to treat his underlying junctional stenosis. Tr. 290.

On February 26, 2016, Trimble saw Dr. Benjamin J. Bixenmann, M.D., for a disability examination relating to his ongoing neck and back pain problems. Tr. 843. Trimble's gait was symmetric, his tandem gait was normal, his straight leg raises were negative, his sensation was intact, and he had 5/5 strength in all muscle distributions of the lower extremities. Tr. 844. Trimble had some restricted range of motion, but no focal tenderness of the spine. Tr. 844. Trimble reported he experienced daily continuous pain in his neck that radiated into his arms, and low back pain that radiated into his legs. Tr. 844. His medications did not provide relief, and he needed Ambien to sleep at night. Tr. 844. Trimble had been working under Dr. Cornett's January 4, 2016, restrictions but no longer felt he could complete his duties. Tr. 844. Dr. Bixenmann concluded:

> He is scheduled for another lumbar spine decompression and fusion surgery in May 2016. I do not have a high degree of confidence that this surgery will improve his condition given prior results. Therefore, given his current degree of pain and limited mobility I agree with the prior work restrictions delineated by Dr. Cornett on 1/4/16 and given the description of

11

the duties of a State Patrol officer do not believe that he can complete these tasks on a daily basis.

Tr. 844.

On February 29, 2016, EMG testing was performed on Trimble's legs and showed no evidence of neuropathy or radiculopathy. Tr. 376. On March 4, 2016, Trimble started aqua therapy and received trigger-point injections. Tr. 393, 579. On March 5, 2016, he saw Peters for primary care. Tr. 590. Peters noted Trimble's ongoing neck and back issues and that he took Ambien due to PTSD issues. Tr. 590-91. On March 11, 2016, Trimble saw a neurologist. Tr. 544. Trimble's gait was antalgic and his sensation, coordination, and muscle tone of both the upper and lower extremities were normal. Tr. 380-81. Trimble's grip testing revealed 4/5 muscle strength on the left side and 5/5 muscle strength on the right side. Tr. 380. Some weakness was noted in the left arm compared to the right and the neurologist increased Trimble's gabapentin. Tr. 546-47.

On March 14, 2016, Trimble returned to Dr. Cornett and described his neck issues. Tr. 547. Dr. Cornett said he did not believe an additional surgery would be beneficial and noted: "I think if he wishes to have that additional level fused through Dr. Treves, that from my standpoint, that would be okay. I do not feel that his findings are severe enough to warrant an additional surgery, but I certainly would not hold it against him if he chooses to have that done through him, and I am sure Dr. Treves is trying to help him." Tr. 548. On March 28, 2016, a provider at the VA's pain clinic opined that Trimble's lumbar radiculitis was "[l]ikely secondary to lumbar postlaminectomy syndrome." Tr. 552. Trimble's gait was unremarkable, his posture normal, his sensation intact, and his lumbar spine range of motion was mildly restricted. Tr. 551-52. Trimble reported that he planned

to proceed with an extension of his lumbar fusion in May. Tr. 552. Trigger-point injections were performed on April 18, 2016. Tr. 553.

On April 3, 2016, Trimble was diagnosed with mild obstructive sleep apnea after a sleep study. Tr. 371. On April 26, 2016, he had a cervical spine MRI. Tr. 306-07. Severe left-sided neural foraminal narrowing was noted at C4-C5 and bilaterally at C6-C7. Tr. 307. On April 29, 2016, in a letter to Trimble, the neurologist said "the neck MRI didn't show any worsening of the previous radiculopathy." Tr. 579.

On April 27, 2016, Trimble had a spinal-cord-injury examination consultation. Tr. 563. Trimble had decreased range of motion and tenderness in his back. Tr. 566. He had decreased sensation in both feet. Tr. 569. He reported constant and intermittent pain, paresthesias and/or dysesthesias, and numbness in both legs. Tr. 570. He frequently used a back brace. Tr. 571-72.

On May 5, 2016, Peters noted that Trimble had full range of motion of all extremities with the exception of some limitation with forward flexion of the lumbar spine. Tr. 592. Trimble's cranial nerves were grossly intact and he had no focal motor or sensory defects. Tr. 592. On May 17, 2016, Trimble returned to Peters for a pre-operative examination. Tr. 594. Peters noted that Trimble exhibited lumbar pain, no focal motor or sensory defects, and full range of motion of all extremities. Tr. 596-97.

On May 18, 2016, Dr. Treves performed surgery, inter alia, extending Trimble's prior fusion to the L4 level. *See* Tr. 293-95. On June 21, 2016, Trimble saw Dr. Treves for a follow up. Tr. 291. Dr. Treves checked x-rays and noted the hardware looked fine and Trimble appeared to have good alignment. Tr. 291, 296. Trimble was doing well post-operatively but was still in pain. Tr. 291. Dr. Treves observed that Trimble was able to

13

stand and walk independently with good lower extremity strength. Tr. 291.Dr. Treves directed Trimble "to gradually increase walking and other light activities" and to keep lifting to the 20-pound range and be careful lifting his children. Tr. 291.

On July 1, 2016, Trimble saw a psychologist to explore re-engaging in services relating to his PTSD, which appeared to be exacerbated by a recent back surgery. Tr. 363. The provider referred Trimble for psychotherapy and noted Trimble had been treated in the PTSD clinic in 2005. Tr. 364. The PTSD clinic recommended treatment at the Vets Center. Tr. 365. On August 9, 2016, Trimble saw Dr. Rebecca Schmidt, a psychiatrist, for treatment of his depression, anxiety, and PTSD. Tr. 353. Due to his back and neck injuries, Trimble had become depressed and anhedonic, with occasional suicidal ideation. Tr. 353. He also had significant anxiety, especially around a lot of people. Tr. 353. Trimble reported forgetting "a lot of little things lately" and often mislaying things such as his phone. Tr. 353. Trimble appeared depressed with a blunted affect. Tr. 356. Dr. Schmidt prescribed Cymbalta and diagnosed Trimble with major depressive disorder, recurrent, moderate, and PTSD. Tr. 357.

On August 11, 2016, Trimble saw Peters for primary care. Tr. 614. Physical therapy, aquatic therapy and other treatment had only minimally improved his symptoms. Tr. 615. Trimble questioned whether he could have "'fibromyalgia', etc." Tr. 615. Peters said it was difficult for Trimble to manage high-dose chronic narcotic pain medications through primary care. *See* Tr. 615. Peters increased Trimble's oxycodone, maximized his gabapentin dose, and set up an evaluation with a pain doctor in September, hoping the pain doctor would assume control of all pain medications. Tr. 617. On September 13, 2016, Trimble was seen at the pain clinic. Tr. 618. He described his pain as sharp,

14

shooting, electric-like, throbbing, and pressure. Tr. 618. He rated his pain at 7 out of 10.

Tr. 618-19). Straight-leg-raise testing was positive on the left. Tr. 619. The provider

planned to proceed with lumbar trigger-point injections and said a spinal cord stimulator

could be considered later. Tr. 620. On December 9, 2016, Trimble underwent "Pain-Psych

Testing" regarding a potential trial for a spinal-cord stimulator. Tr. 341-47. The

psychologist concluded:

> From a psychological standpoint, Mr. Trimble appears to be a poor to fair
> candidate for a spinal cord stimulator trial at this time. A primary concern is
> that Trimble just began receiving mental health intervention in the past five
> months for chronic anxiety and depression, and he continues to struggle
> with significant sleep and mood disturbance.

Tr. 345-46. On December 20, 2016, Trimble saw Dr. Schmidt for psychiatric medication

management. Tr. 645. Trimble's mood was irritable, and his affect blunted due to pain.

Tr. 646. Dr. Schmidt continued his current medications. Tr. 646. On December 21, 2016,

Trimble received trigger-point injections. Tr. 648-51. On January 26, 2017, a trial spinal

cord stimulator was implanted. Tr. 746-47. On February 2, 2017, the trial was deemed to

be a failure. *See* Tr. 728-30. On March 7, 2017, Trimble received trigger-point injections

and a radiofrequency ablation. Tr. 722-28. He also received acupuncture treatment,

massage therapy, and chiropractic treatment in his search for pain relief. *See, e.g.,* Tr.

707, 791, 800.

In a December 12, 2016, Function Report, Trimble said he fed his children, made

bottles, and changed diapers. Tr. 194. He also drove, shopped in stores, prepared

complete meals five days a week, and used a riding lawnmower on a weekly basis without

help or encouragement. Tr. 195-96. Trimble also said he did not need accompaniment

when leaving the home, nor help or reminders to take his medication. Tr. 195-97.

On August 3, 2017, Trimble returned to Peters, still in pain and limping. Tr. 775-78. Peters offered his opinions as to Trimble's work limitations on that day. *See* Tr. 756-60. Trimble continued to receive chiropractic treatment through at least September of 2017. *See* Tr. 808-26. The September 28, 2017, chiropractor note said Trimble's shooting pains sometimes reached both feet. Tr. 826. Standing, sitting, bending, and stooping aggravated his pain. Tr. 826. He had constant pain that worsened when he looked down. Tr. 826. Pain radiated into his arms and hands. Tr. 826. He noticed weakness in both arms due to pain. Tr. 826. The chiropractor noted muscle weakness throughout both legs. Tr. 826. Shoulder abduction and hand grip testing showed weakness in both arms. Tr. 826. The chiropractor manipulated the C7, T3 and L3 levels at this appointment. Tr. 827.

## III. TREATING AND EXAMINING SOURCE OPINIONS

On January 4, 2016, Dr. Cornett, the treating neurosurgeon that performed Trimble's first lumbar spine decompression and fusion surgery, provided his opinions as to Trimble's limitations. *See* Tr. 856. Dr. Cornett said Trimble should not stand or walk more than two hours at a time, or sit for more than two hours, and that "[p]atient may not be able to complete a full shift due to pain/discomfort from the injury noted above." Tr. 856. On February 26, 2016, Dr. Bixenmann, an examining neurosurgeon, agreed with Dr. Cornett's limitations. *See* Tr. 844. ("I agree with the prior work restrictions delineated by Dr. Cornett on 1/4/16"). On April 27, 2016, Christine Head, MS, PA-C, the examiner for Trimble's spinal cord injury "C & P" examination, appears to have agreed with Dr. Cornett's limitations after examining Trimble. *See* Tr. 578.

On August 3, 2017, Peters, Trimble's primary care provider through the VA, provided his opinions as to Trimble's work limitations. Tr. 756-60. Peters said Trimble was

16

limited by cervical neck pain and low back pain, with a gait abnormality. Tr. 756. Depression, anxiety, other psychological factors, and PTSD affected Trimble's physical condition. Tr. 757. Pain constantly interfered with his attention and concentration. Tr. 757. He was incapable of even low stress jobs. Tr. 757. He could sit for 20 minutes at a time and stand for 20 minutes at a time. Tr. 758. He could sit for less than two hours in an 8-hour workday and could stand/walk for less than two hours in an 8-hour workday. Tr. 758. He was expected to be absent from work due to his impairments and treatment more than four days per month. Tr. 759. Peters said his opinions applied beginning May 27, 2016, which was shortly after the date of Trimble's second lumbar fusion surgery. *See* Tr. 759.

## STANDARD OF REVIEW

"When considering whether the ALJ properly denied social security benefits, [the Court] determine[s] whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe*, 226 F.3d at 971). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (citation omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (citation omitted). Nevertheless, the Court's "review extends beyond examining the record to find substantial evidence in support of the ALJ's decision." *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir.

2007)).  The Court must "also consider evidence in the record that fairly detracts from that decision." *Id.* (quoting *Cox*, 495 F.3d at 617).

The Court also must determine whether the Commissioner's decision "is based on legal error." *Collins*, 648 F.3d at 871 (quoting *Lowe*, 226 F.3d 971). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citations omitted). No deference is owed to the Commissioner's legal conclusions. *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003) (stating that allegations of legal error are reviewed de novo).

## DISCUSSION

Trimble alleges the ALJ erred by failing to provide adequate explanation for the weight afforded to the opinions of 1) Trimble's treating surgeon, Dr. Cornett; 2) the examining surgeon, Dr. Bixenmann; and 3) Trimble's primary care provider, Peters.

### I.    Opinion of Trimble's Treating Surgeon, Dr. Cornett

"Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)(2)). If "a treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," it must be given controlling weight. 20 C.F.R. § 404.1527(c)(2).[6] When a treating source's medical opinion is not

---

[6] An application for benefits is considered filed on the day it is received by an employee at any social security office. 20 C.F.R. § 404.614. Trimble filed for benefits on November 17, 2016. Tr. 11. The standards set forth in 20 C.F.R. § 404.1527 apply for evaluating opinion evidence for claims filed before March 27, 2017.

given controlling weight, the factors contained in 20 C.F.R. § 404.1527(c)(2)(i) and (c)(2)(ii), and 20 C.F.R. § 404.1527(c)(3)-(6), are applied to determine the weight to give the medical opinion. *Id.* The factors to be considered are 1) length of the treatment relationship and frequency of examination, 2) nature and extent of treatment relationship, 3) supportability, 4) consistency, 5) specialization, and 6) other factors. 20 C.F.R. § 404.1527. "[T]he ALJ must 'give good reasons' to explain the weight given the treating physician's opinion." *Anderson*, 696 F.3d at 793 (quoting 20 C.F.R. § 404.1527(c)(2)).

On January 4, 2016, after Trimble's initial surgery in 2015, Dr. Cornett examined Trimble. *See* Tr. 523. Dr. Cornett stated that, overall, he saw nothing serious or dangerous going on and could not completely explain Trimble's symptoms or why he did well for a time and was now having some increasing symptoms. Tr. 524. Dr. Cornett noted Trimble was "working on getting out of being a state patrolman, as all the driving and duties, as well as the heavy belt he has to carry, he does not feel are consistent with what he can tolerate pain wise." Tr. 524. Dr. Cornett stated he "did fill out a worksheet for [Trimble], placing him on restricted duty, limiting his lift, bending and sitting." Tr. 524. Dr. Cornett sent Trimble to neurology and Dr. Cornett's notes stated he was "a little confused as to why [Trimble's] symptoms are so severe and I think his imaging is not severe." Tr. 524. Dr. Cornett recommended "some soft tissue work either through therapy or chiropractor" and discussed radiofrequency ablation, aquatic physical therapy, and reevaluation in 8 to 12 weeks. Tr. 524.

The "worksheet"[7] completed by Dr. Cornett restricted Trimble from lifting over 10 lbs, carrying over 30 lbs, standing/walking for 2 hours, sitting for 2 hours, pushing/pulling 30 lbs, upper body trunk rotation, kneeling, crawling, and bending. Tr. 856. Dr. Cornett also opined Trimble "may not be able to complete a full shift due to pain/discomfort from the injury . . . ." Tr. 856. The ALJ discounted Dr. Cornett's opinion for several reasons but also stated that "overall, this opinion is generally consistent with the RFC . . . ." Tr. 19. Trimble argues that Dr. Cornett's opinions should have been afforded controlling weight and, if his opinions were afforded controlling weight, Trimble would have been found disabled. Alternatively, Trimble asks the Court to reverse and remand to allow further evaluation of Dr. Cornett's opinions.

Dr. Cornett's lifting-and-carrying restrictions are consistent with Trimble's RFC. 20 C.F.R. § 404.1567 ("Sedentary work involves lifting more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."). Dr. Cornett's standing/walking and pushing/pulling limitations are also consistent with the RFC. SSR 96-9p, 1996 WL 374185, at *6 ("Limitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base. . . . If an individual can stand and walk for a total of slightly less than 2 hours per 8-hour workday, this, by itself, would not cause the occupational base to be significantly eroded"). The same is true for Dr. Cornett's postural-kneeling and crawling restrictions. SSR 96-9p, 1996 WL 374185, at *7 ("Postural limitations or restrictions related to such activities as . . . kneeling . . . or crawling would not usually erode the occupational base for a full range

---

[7] The document completed by Dr. Cornett is titled "Nebraska State Patrol Attending Physician's Medical Report." Tr. 856.

of unskilled sedentary work significantly because those activities are not usually required in sedentary work.").

The ALJ also was entitled to give less weight to Dr. Cornett's postural limitation, including his restrictions on bending and upper body trunk rotation, due to vagueness. The Eighth Circuit has recognized that "[a] treating physician's assessments 'possess little evidentiary value' when they 'consist of nothing more than vague, conclusory statements,' such as 'checked boxes, circled answers, and brief fill-in-the-blank responses.'" *Hilliard v. Saul*, No. 19-1169, 2020 WL 3864288, at *2 (8th Cir. July 9, 2020) (quoting *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018)). Trimble's restrictions were presented on a checklist-format medical report, Tr. 856, and Dr. Cornett's treatment notes from the same day do not reflect the same absolute prohibitions on activities, Tr. 524 (noting "limited flexion/extension due to pain" and stating "I did fill out a worksheet for [Trimble], placing him on restricted duty, limiting his lifting, bending, and sitting"). Thus, the ALJ did not err in giving this portion of Dr. Cornett's opinion "only some weight."

Trimble also argues the ALJ erred in giving "very little, if any" weight to Dr. Cornett's opinion that Trimble "may not be able to complete a full shift due to pain/discomfort." The ALJ said he gave very little, if any, weight to this portion of Dr. Cornett's opinion because Dr. Cornett has no real way of knowing whether or not Trimble would actually be able to complete a full shift and does not specify whether Dr. Cornett is referring to a shift as a state patrolman or some other sedentary occupation. The ALJ was correct. Dr. Cornett would have no way of knowing whether Trimble could complete a full shift at a sedentary position as this is a decision reserved for the Commissioner. *See Mclevis v. Colvin*, No. CIV. 14-1426 DWF/HB, 2015 WL 4920289, at *23 (D. Minn. Aug. 12, 2015) (ALJ did not

21

err in rejecting opinion that claimant could not work a forty-hour workweek, because such a determination is an administrative determination reserved for the Commissioner); *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) ("[claimant's treating physician's] finding that claimant was 'totally disabled' gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." (internal quotations omitted)); *Perkins v. Astrue*, 648 F.3d 892, 898 (8th Cir. 2011) ("[a] treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."). Thus, the ALJ did not err in rejecting this opinion.

The temporary nature of Trimble's alleged disability also supports the ALJ's decision not to give controlling weight to Dr. Cornett's proposed restrictions.  Dr. Cornett indicated on the "worksheet" that Trimble had not reached maximum medical improvement, Tr. 856, thus suggesting the proposed restrictions were temporary.  This suggestion is also supported by the fact that Dr. Cornett indicated the duration of the restrictions was "[u]nknown"; Trimble was to return for evaluation in 8-12 weeks; and he was referred to neurology. Tr. 856. Other courts have held that where work restrictions are only temporary in nature they are entitled to less weight or are of little use in determining whether a claimant is disabled. *See Sibley v. Soc. Sec. Admin.*, No. 2:18-0027, 2019 WL 2571735, at *6 (M.D. Tenn. Apr. 30, 2019), *adopted by*, No. 2:18-CV-00027, 2019 WL 2569552 (M.D. Tenn. June 21, 2019) (restrictions assigned were short-term in nature and therefore of little use in determining whether claimant was disabled); *Hiltunen v. Colvin*, No. 2:14-CV-13315, 2015 WL 5472287, at *3 (E.D. Mich. Sept. 17, 2015) (affirming ALJ's decision to "grant[ ] little weight to these off-work slips because

22

they were intended to be only temporary restrictions"); *Moorer v. Astrue*, No. 3:06CV434/LAC/EMT, 2007 WL 4336080, at *10 (N.D. Fla. Dec. 7, 2007) ("it appears that the work restrictions were temporary and likely issued as a cautionary measure pending the results of Plaintiff's MRI and x-ray tests"); *see also Turpin v. Colvin*, 750 F.3d 989, 994 (8th Cir. 2014) ("Even if [claimant] was disabled on June 30, 2005, there was substantial evidence that she could not meet the duration requirement that the disability lasted or was expected to last for twelve months."). Thus, the ALJ did not err in the weight assigned Dr. Cornett's opinion. When considering the temporary nature of the restrictions in the opinion, it was generally consistent with the RFC.

Trimble argues that "[b]ecause the interventions Dr. Cornett had suggested trying wound up failing, if re-contacted on this issue it is likely Dr. Cornett would have concluded his restriction opinions were permanent." Pl. Br., ECF No. 13, Page ID 925. During a telephone call with Cathleen Edmonson, RN, on March 18, 2016, Trimble discussed the possibility of getting a whirlpool for home use. Tr. 550. The notes state, "He is currently participating in aqua therapy in the community and this seems to help his back considerably." Tr. 550. A March 28, 2016, note from the pain clinic states that Trimble "continues to participate in aqua therapy with some benefit." Tr. 550. Thus, there is evidence in the record that Dr. Cornett's suggestions provided at least some relief and the ALJ did not err in failing to recontact Dr. Cornett.

## II.   Opinion of Examining Surgeon, Dr. Bixenmann

Dr. Bixenmann is a consultative examiner who examined Trimble on at least one occasion. Thus, the weight to be given to his opinion is determined by the factors listed under 20 C.F.R. § 404.1527(c). Trimble alleges the ALJ erred by not specifically

mentioning the opinion of Dr. Bixenmann in his decision but instead including only a citation to the opinion in a parenthetical when discussing the opinion of Dr. Cornett.

On February 26, 2016, Trimble saw Dr. Bixenmann for a disability examination relating to his ongoing neck and back pain. Tr. 843. Trimble reported he experienced daily continuous pain in his neck that radiated into his arms, and low back pain that radiated into his legs. Tr. 844. His medications did not provide relief, and he needed Ambien to sleep at night. Tr. 844. Trimble had been working under Dr. Cornett's January 4, 2016, restrictions but believed he no longer could fulfill his duties. Tr. 844. Dr. Bixenmann concluded:

> He is scheduled for another lumbar spine decompression and fusion surgery in May 2016. I do not have a high degree of confidence that this surgery will improve his condition given prior results. Therefore, given his current degree of pain and limited mobility I agree with the prior work restrictions delineated by Dr. Cornett on 1/4/16 and given the description of the duties of a State Patrol officer do not believe that he can complete these tasks on a daily basis.

Tr. 844.

Trimble argues the ALJ "mistakenly thought Exhibit 8F (the Dr. Bixenmann exhibit) was a copy of Exhibit 10F (the Dr. Cornett exhibit)." Pl. Br., ECF No. 13, Page ID 926. The Commissioner argues that the ALJ's inclusion of the citation to 8F, when discussing Dr. Cornett's opinion, indicates he considered Dr. Bixenmann's opinion but assigned it only some weight for the same reason he assigned Dr. Cornett's opinion some weight, and that any error was harmless. Def. Br., ECF No. 18, Page ID 982.

"The Eighth Circuit recognizes the doctrine of harmless-error in Social Security cases." *Brown v. Colvin*, 992 F. Supp. 2d 947, 953 (D. Neb. 2014), *aff'd*, 581 F. App'x 598 (8th Cir. 2014) (citing *Byes v. Astrue*, 678 F.3d 913, 917-18 (8th Cir. 2012)). An

administrative finding will not be set aside based on an "arguable deficiency in opinion-writing technique" when it is unlikely it affected the outcome. *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (quoting *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)). The harmless error standard was applied where an ALJ did not adequately discuss the opinion of a physician. *See Parton v. Astrue*, No. 3:07-CV-063-J-TEM, 2008 WL 897094, at *5 (M.D. Fla. Mar. 31, 2008) ("[T]he Court does not find remand is warranted under the facts of this case because the ALJ's failure to address Plaintiff's treating physician's opinion was harmless error."); *but see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 750 (6th Cir. 2007) ("[I]nvoking the harmless-error exception here—where the ALJ entirely failed to address the primary treating source's presumptively supportable opinion—plainly risks having the exception swallow up the rule."). To prove an error was not harmless, a plaintiff must provide "some indication that the ALJ would have decided differently if the error had not occurred." *Brown*, 992 F. Supp. 2d at 953 (quoting *Byes*, 678 F.3d at 917).

Trimble argues that, while the opinion of Dr. Bixenmann mirrors Dr. Cornett's opinion in some ways, the ALJ should have noted that two neurosurgeons, not one, agreed on Trimble's work limitations. Pl. Br., ECF No. 13, Page ID 926-27. Trimble also argues that Dr. Bixenmann's opinion differs from Dr. Cornett's in that Dr. Bixenmann believed Dr. Cornett's restrictions would be permanent. Pl. Reply Br., ECF No. 19, Page ID 995. In support, Trimble points to Dr. Bixenmann's statement that "[Trimble] is scheduled for another lumbar spine decompression and fusion surgery in May 2016. I do not have a high degree of confidence that this surgery will improve his condition given prior results." Tr. 844. Yet this argument fails because there is no evidence that Dr.

Cornett's opinion that Trimble had not reached maximum medical improvement was based on a perception that Trimble would benefit from the May 2016 surgery. Dr. Cornett recommended soft tissue work, radiofrequency ablation, and aquatic physical therapy. Tr. 524.

On February 4, 2016, Trimble obtained a second opinion from Dr. Treves, the surgeon who performed the May 2016 surgery. *See* Tr. 287. On March 14, 2016, Dr. Cornett said he did not believe an additional surgery would be beneficial and noted that he did not think the findings were severe enough to warrant another surgery. Tr. 548. It is clear Dr. Cornett's reference to Trimble not having reached maximum medical improvement was not in anticipation of a benefit from subsequent surgery.

Trimble has not provided "some indication that the ALJ would have decided differently" had he separately analyzed Dr. Bixenmann's opinion; thus, the Court finds that any error on the part of the ALJ with respect to his consideration of Dr. Bixenmann's opinion was harmless and does not require reversal or remand. This is especially true given the ALJ's characterization of Dr. Cornett's proposed restrictions as temporary and the short period of time between Trimble's appointment with Dr. Cornett and his appointment with Dr. Bixenmann.

### III.    Opinion of Trimble's Primary Care Provider, Mr. Peters

Physician's assistant Peters is Trimble's primary care provider. Physician's assistants are categorized as other medical sources. *Patsios v. Colvin*, No. 4:13-CV-3134, 2015 WL 926126, at *8 (D. Neb. Mar. 4, 2015) (citing *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007); 20 C.F.R. § 404.1513(a)). "Opinions from other medical sources should be evaluated using the same factors used to evaluate opinions from acceptable

medical sources, set forth in 20 C.F.R. § 404.1527(c)." *Id.* (citation omitted). More weight is given to a medical source when relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, is present. 20 C.F.R. § 404.1527(c)(3). More weight is given to a medical opinion that is consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(4). An ALJ may discount an opinion based on a claimant's subjective complaints, rather than objective medical evidence, and may further discount or disregard any conclusions based on the claimant's discredited subjective complaints. *Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014) (citations omitted).

On August 3, 2017, Peters saw Trimble for a follow up of Trimble's ongoing neck and back pain. Tr. 775-76.  Peters noted that Trimble's pain radiated to both legs, he limped, and his ability to lift, stoop, and bend was very limited. Tr. 776. The notes also state "[r]ange of motion is full in all extremities. Paraspinous lumbar spasm and pain with flexion and extension. Gait is guarded moderately, but independent." Tr. 778. On this same day Peters completed a Physical Residual Functional Capacity Questionnaire. Tr. 756-60. Peters opined, among other things, that Trimble could not walk a single city block without rest or severe pain; his pain constantly interfered with his attention and concentration; he would require a 10-15 minute break every thirty minutes; he could sit or stand for less than two hours per day; and he would likely miss four days of work per month. Tr. 757-58. Peters limited his opinion to the time period after May 27, 2016, which was after Trimble's second surgery. Tr. 759.

At a prior appointment, on August 11, 2016, Peters's progress notes indicated a guarded gait, paraspinous spasm, and Trimble's reports of subjective lumbar pain. Tr.

617. Peters's notes state "[p]atient needs to stay active" and a referral for a pain clinic consult. Tr. 617.

When considering Peters's opinion, the ALJ acknowledged the treating relationship but stated that the source statement contained extreme physical and mental limitations that have "no reliable, factual basis within the record." Tr. 18. The ALJ also stated that Trimble's own admissions as to his daily activities are inconsistent with this opinion statement. Tr. 18. In an earlier portion of the ALJ's opinion the ALJ acknowledged Trimble's complaints of disabling symptoms and limitations. Tr. 16. However, the ALJ found that Trimble engaged in "socializing and activities that are not limited to the extent one would expect, given his complaints of disabling symptoms and limitations." Tr. 16.

"[A] person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000)). "In evaluating a claimant's RFC, consideration should be given to the quality of the daily activities and the ability to sustain activities, interests, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities must also be considered." *Id.* (emphasis in original) (quoting *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir.2007)).

On December 12, 2016, Trimble completed a telephonic SSA Function Report. Tr. 193-200. The report states that Trimble mows using a riding lawn mower weekly for "about two hours," Tr. 195, prepares complete meals for his family for an hour five days per week, drives, shops, Tr. 195-96, and can maintain attention for a "couple of hours," Tr. 198. Trimble testified at the hearing that he goes on 5-7 block walks with his family, Tr.

28

47, and cares for his two young children[8] throughout the day while his wife is at work, Tr. 47-49. Trimble notes that, when he walks with his family, he uses his son's stroller as an assistive device and often lags behind. Pl. Br. ECF No. 13, Page ID 928; Tr. 46-47. Trimble also testified he must find a comfortable position or stretch his back in the middle of household chores. Tr. 50.

The ALJ did not err in concluding that Trimble's own admissions as to his daily activities were inconsistent with Peters's opinion. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (fact that claimant "continues to engage in many normal daily living activities including driving, shopping, visiting with friends and relatives, and picking up her grandchild" supported finding that pain was not as severe as claimant alleged); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir.1999) (finding activities such as driving his children to work, driving his wife to school, shopping, visiting his mother, taking a break with his wife between classes, watching television, and playing cards were inconsistent with plaintiff's complaints of disabling pain); *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) ("[Claimant's] daily activities, which included fishing and dog training, were likewise inconsistent with [treating physician's] opinion regarding [claimant's] limitations.").

Because the ALJ properly discredited Trimble's subjective complaints of disabling pain, the ALJ did not err in finding no reliable factual basis to support Peters's extreme limitations. Thus, the ALJ sufficiently explained the weight afforded to Peters's opinions and the ALJ's decision is supported by substantial evidence in the record.

---

[8] Trimble testified his children were age three-and-a-half and one-and-a-half at the time of the hearing. Tr. 47.

## IV.    Constitutionality of the ALJ's appointment as an inferior officer

"As of 2017, [ALJs] in the Social Security Administration [(SSA)] were not appointed by the head of the agency, but rather by lower-level officials." *Davis v. Saul*, 963 F.3d 790. 792 (8th Cir. 2020). On June 21, 2018, the Supreme Court decided that administrative law judges of the Securities and Exchange Commission are "Officers of the United States" who must be appointed by the President, a court of law, or a head of a department. *Lucia v. SEC*, 138 S. Ct. 2044, 2051, 2055 (2018). The Court stated that "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief." *Id.* at 2055 (internal quotation and citation omitted).

Trimble argues that the ALJ that decided his case was an inferior officer that was not properly appointed under the Appointments Clause, which warrants the ALJ's denial of benefits be vacated and Trimble's claim remanded for a new hearing before a new, constitutionally appointed, ALJ. Pl. Br., ECF No. 13, Page ID 929. The Commissioner argues that because Trimble failed to raise his Appointments Clause challenge at any point in the administrative process his challenge is untimely, and he has forfeited his Appointments Clause claim. Def. Br., ECF No. 18, Page ID 984-85. Trimble argues that exhaustion of his Appointments Clause argument was not required and would have been futile. Pl. Br., ECF No. 13, Page ID 934.

The Eighth Circuit recently addressed the issue of whether failure to raise an Appointments Clause challenge before the SSA resulted in forfeiture. *Davis*, 963 F.3d at 791-92. In *Davis*, the claimants argued that "constitutional claims need not be exhausted, that exhaustion of this particular constitutional challenge would have been futile, and that

the court should exercise its discretion to waive any applicable exhaustion requirement." *Id*. at 794. The Eighth Circuit concluded that exhaustion was required, and this was not "'one of those rare cases in which we should exercise our discretion' to consider a non-exhausted claim." *Id*. at 795 (quoting *Freytag v. Comm'r*, 501 U.S. 868, 879 (1991)). The court also rejected the futility argument stating

> Repetition of [an] objection . . . might lead to a change of policy, or, if it did not, the [agency] would at least be put on notice of the accumulating risk of wholesale reversals being incurred by its persistence. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). Even if an individual ALJ was powerless to address the constitutionality of her appointment, the agency head—alerted to the issue by claimants in the adjudicatory process—could have taken steps through ratification or new appointments to address the objection.

*Id*. at 794-95 (alterations in original). Other circuit courts have disagreed on whether exhaustion of the Appointments Clause issue before the SSA is required. *Compare Carr v. Comm'r*, 961 F.3d 1267, 1275-76 (10th Cir. 2020) (exhaustion required), *with Cirko v. Comm'r*, 948 F.3d 148, 159 (3d Cir. 2020) (exhaustion not required).

Like the claimants in *Davis*, Trimble did not present his Appointments Clause claim either before the ALJ or the Appeals Council. Trimble argued futility based on the issuance of EM-18003,[9] and Berryhill's lapse in authority, between November 2017 and

---

[9] On January 30, 2018, the agency's Office of General Counsel issued an emergency measure warning ALJs that they might receive Appointments Clause challenges and instructed them not to "discuss or make any findings related to the Appointments Clause issue," because the "SSA lacks the authority to finally decide constitutional issues such as these." Soc. Sec. Admin., EM-18003*: Important Information Regarding Possible Challenges to the Appointment of Administrative Law Judges in SSA's Administrative Process* (2018). The agency directed the ALJs to acknowledge when the issue had been raised. *Id*.

On June 25, 2018, the SSA's Office of Hearing Operations issued a revised emergency measure. Soc. Sec. Admin., EM-18003 REV: *Important Information Regarding Possible Challenges to the Appointment of Administrative Law Judges in SSA's Administrative Process* – UPDATE (2018). This measure continued to instruct ALJs to acknowledge, but not to address, challenges based on the Appointments Clause. *Id*. The Appeals Council was instructed not to "acknowledge, make findings related to, or otherwise discuss the Appointments Clause issue." *Id*.

April 2018, that led the SSA to lack a Department Head that could provide a remedy for an Appointments Clause challenge. This Court finds these arguments without merit.

Trimble's hearing was held on November 1, 2017, and the ALJ's decision was issued on December 26, 2017. Tr. 11, 22. EM-18003 was not in effect at the time of the hearing or the ALJ's decision but was in effect at the time of the Appeals Council decision dated March 7, 2018. *See* Tr. 1. However, nothing contained in EM-18003 prevented Trimble from raising the Appointments Clause challenge to the ALJ or the Appeals Council. Trimble's hearing occurred before the time period in which he argues the SSA was unable to appoint ALJs due to the lapse of authority. *See* Pl. Reply Br., ECF No. 19, Page ID 996-97 ("[N]o one in the Social Security Administration had any power to correct the Appointments Clause issue from shortly after [Trimble's] November hearing until after the Appeals Council had denied review."). The Court is not persuaded that Trimble's raising of the issue would have been any more futile than the requests of the claimants considered, and rejected, by the Eighth Circuit in *Davis*. Thus, for the foregoing reasons, the Court concludes that Trimble has forfeited his Appointments Clause challenge by failing to raise it during his administrative proceedings.

## CONCLUSION

For the reasons stated above, the Motion for an Order Reversing the Commissioner's Decision, ECF No. 16, will be denied, and the Motion to Affirm Commissioner's Decision, ECF No. 17, will be granted. Accordingly,

IT IS ORDERED:

---

1. The Motion for an Order Reversing the Commissioner's Decision, ECF No. 16, filed by Plaintiff Donald L. Trimble, is denied;

2. The Motion to Affirm Commissioner's Decision, ECF No. 17, filed by Defendant Andrew Saul, is granted;

3. The Commissioner's decision is affirmed;

4. The appeal is denied; and

5. A separate judgment will be entered

Dated this 3rd day of August, 2020.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge